**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**ANTHONY RUGGIERO,**

                                        **Plaintiff,**

**v.**

                                                                        **12-CV-147(HKS)**

**ALBERT PRACK,** *et al.*,

                                        **Defendants.**

_____

**DECISION AND ORDER**

        Plaintiff, an inmate at Southport Correctional Facility, asserts that he was

denied due process at two disciplinary hearings, retaliated against for successfully

appealing his first disciplinary sanction, and subjected to cruel and inhumane conditions

of confinement related to the use of mechanical restraints and exposure to unnecessary

health risks.  He seeks relief pursuant to 42 U.S.C. § 1983.  Dkt. #1.  By Decision and

Order signed September 5, 2012 ("Screening Order"), the Hon. David G. Larimer

granted plaintiff's motion to proceed *in forma pauperis*, dismissed several of plaintiff's

claims with prejudice for failure to state a claim upon which relief could be granted, and

directed that many of the named defendants be terminated from the case.  Dkt. #3.


        Plaintiff's amended *pro se* complaint asserts claims against the

following parties in the specified capacities:  Albert Prack, the Director of Special

Housing and Inmate Discipline for New York State Department of Corrections and

Community Supervision ("DOCCS") in his individual capacity (Dkt. #10, ¶ 6); Patrick

Griffin, Superintendent of Southport Correctional Facility ("Southport"), in his individual

capacity (Dkt. #10, ¶ 7); M. Sheahan, Deputy Superintendent of Security at Southport, in his individual capacity (Dkt. #10, ¶ 8); A. Bartlett, Deputy Superintendent of Programs at Southport, in her individual capacity (Dkt. #10, ¶ 9); H. Hetrick, Jr., Correction Captain at Southport, in his individual capacity (Dkt. #10, ¶ 10); K. Signor, Correction Captain at Southport during the relevant time period, in his individual capacity (Dkt. #10, ¶ 11); R. Donahue, Correction Lieutenant at Southport, in his individual capacity (Dkt. #10, ¶ 12); N. Sampsell, Correction Sargent at Southport, in his individual capacity (Dkt. #10, ¶ 13); R. Granger, Correction Officer at Southport, in his individual capacity (Dkt. #10, ¶ 14); M. Labar, Correction Officer at Southport, in his individual capacity (Dkt. #10, ¶ 15); R. Fluman, Correction Officer at Southport, in his individual capacity (Dkt. #10, ¶ 16); Brian Fischer, DOCCS Commissioner, in his individual and official capacities (Dkt. #10, ¶ 17).

On August 7, 2013, the parties consented pursuant to 28 U.S.C. § 636(c) to have the undersigned conduct any and all further proceedings in this case.  Dkt. #27. Thereafter, on March 2, 2015, defendants filed a motion for summary judgment. Dkt. #100.  Plaintiff cross-moved for summary judgment on or about the same date. Dkt. #102.  For the following reasons, defendants' motion is GRANTED IN PART and DENIED IN PART, and plaintiff's cross-motion is GRANTED IN PART and DENIED IN PART.

## **FACTUAL BACKGROUND**

The following facts are taken from the Amended Complaint (Dkt. #10),

Defendants' Statement of Undisputed Facts (Dkt. #100-1), Plaintiff's Statement of Facts

(Dkt. #102); Plaintiff's Affidavit in Support of Summary Judgment (Dkt. #103), Plaintiff's

Statement of Disputed Facts (Dkt. #112); and Defendants' Response to Plaintiff's

Statement of Facts (Dkt. #109-1).  Plaintiff was confined to Southport ("Southport") from

February 26, 2010 through March 14, 2011.  Dkt. #10, ¶ 32.  Southport is the first all

special housing unit ("SHU") facility in the entire DOCCS system.  Dkt. #100-10, ¶ 5.

Because of its "unique status," there are certain security measures in place at Southport

that are not implemented anywhere else in the DOCCS system.  Dkt. #100-10, p. 2, ¶ 5.

Southport employs a "Progressive Inmate Movement System" ("PIMS")

through which inmates earn "privileges" within the facility.  Dkt. #10, ¶¶ 33, 35;

Dkt. #100-14, ¶¶ 8-9 & pp. 55-56.  "PIMS" consists of three levels, level one being the

most restrictive or "lowest" level and level three being the least restrictive or "highest"

level.  Dkt. #10, ¶ 33, 35.  Each level has designated cell blocks or "companies."

Dkt. #100-14, ¶ 9.  The criteria for moving to the next level include 30-day status without

any disciplinary infractions.  Dkt. #100-14, ¶ 9.  An inmate's physical transfer to the next

level "company" can only take place as space permits.  Dkt. #100-14, ¶ 9.

As an inmate moves up through the levels, he receives extra "privileges,"

including the removal of mechanical restraints.  Dkt. #10, ¶ 33; Dkt. #103, ¶ 46.  All

inmates on level one must remain handcuffed with a waist chain even when secured

alone in the exercise cage.[1]  Dkt. #100-14, ¶ 10 & p. 20; Dkt. #103, ¶ 46.  Plaintiff

asserts that level one inmates at Southport are the only SHU inmates in the DOCCS

system that are bound in mechanical restraints inside the exercise cage without an

individual restraint order.  Dkt. #102, ¶ 44.  Defendant Prack, DOCCS Director of SHU

Housing and Inmate Discipline, averred that he was unaware of any other SHU that has

this blanket policy.  Dkt. #103, ¶ 49.  Inmates on level two must be handcuffed with a

waist chain until they are secured within the exercise cage, and those on level three are

handcuffed with no waist chain until they are secured in the cage.  Dkt. #102, ¶ 42; Dkt.

#103, ¶ 46; Dkt. #112-1, ¶ 46.  For level two inmates, the procedure for entering or

leaving the cell and exercise cage is as follows:  the inmate sticks his hands out of the

feed up hatch, handcuffs are applied, he then turns around and exits the cell

backwards, at which time two staff members apply the waist chain.  Dkt. #103, ¶ 45.


          A level two or three inmate who commits a disciplinary infraction, whether

violent or non-violent, is returned to a level one company where he is subjected to the

mechanical restraint policy and the requirement of serving 30 days without a disciplinary

infraction.  Dkt. #100-14, ¶ 13 & pp. 14, 56; Dkt. #102, ¶ 55; Dkt. #103, ¶ 53.  At every

other SHU operated by DOCCS, the only way an inmate may be bound in mechanical

restraints inside the exercise cage is by a written individual restraint order stating the

reasons why the removal of restraints in the exercise area would, in light of the

particular circumstances relative to the affected inmate, present a threat to the safety or

security of the inmate, other persons or state property.  *See* NY DOCCS Directive No.

4933, § 305.4(e)(5) (codified at 7 N.Y.C.R.R. 305.4(e)(5)); Dkt. #102, ¶ 56; Dkt. #103,

---

[1] The walls and ceiling of the exercise cage are cross-hatched iron bars and the floor is concrete.  Dkt. #103, ¶ 45.

¶ 54.  Section 305.4(c) provides an appeal mechanism for any SHU inmate subject to a written individual restraint order.  Dkt. #102, ¶ 57; Dkt. #103, ¶ 55.  Southport's level one mechanical restraint policy does not require a written justification and does not provide an appeal mechanism.  Dkt. #102, ¶ 58; Dkt. #103, ¶ 56; 7 N.Y.C.R.R. 305.4(e)(5) (stating "[t]his paragraph [permitting inmates under a restraint order to be released from mechanical restraints while in the exercise area absent a written justification] does not apply to Southport Correctional Facility").

Southport was a general population facility converted into a SHU facility.  Dkt. #10, ¶ 35.  For this reason, the cells are not comprised of four solid walls and a door as they are in modern SHU facilities; rather, the front of the cell is covered by cross-hatched iron bars about one and one half inches apart.  Dkt. #10, ¶ 36.  On level one companies, the entire front of the cell (other than the door) is covered with plexiglass.  Dkt. #10, ¶ 36.  The feed up slots on levels two and three are built into the cell doors, enabling the occupant of a given cell to reach his arm through the feed up slot and throw water, urine, or feces on the occupant of the neighboring cell.  Dkt. #10, ¶¶ 38-39.

On July 8, 2010, plaintiff was housed in a level three cell, having progressed through levels one and two.  Dkt. #10, ¶ 40.  Plaintiff claims that the inmate in the neighboring cell was throwing liquid, which plaintiff believed to be urine, into his cell.  Dkt. #10, ¶ 41.  Plaintiff alleges that he covered the front of his cell with his blanket to protect himself from being pelted with urine.  Dkt. #10, ¶ 43.  Correctional officer

Diehr,[2] who was on rounds on the company, told plaintiff to remove his blanket from the bars. Dkt. #10, ¶¶ 43-44. According to Diehr, plaintiff responded to his direct order by yelling: "what the fuck is wrong with you, I'll throw a cup of shit in your face you fat hillbilly faggott!" Dkt. #100-3, p. 8. Plaintiff claims that he explained to Diehr that he could not remove the blanket because he had to defend himself from being hit with urine, the officer became belligerent, and fabricated the allegation that plaintiff verbally threatened to throw feces on him. Dkt. #10, ¶ 46. As a direct result of that allegation, plaintiff was moved to a shielded level one cell, where he claims he remained for hours, without his property, sitting on a bare mattress. Dkt. #10, ¶¶ 48-50.

According to plaintiff, defendant R. Fluman, the officer on his level one company that evening, did not issue plaintiff his in-cell property or his dinner tray. Dkt. #10, ¶¶ 51-52. Fluman alleges that while he was on his "count round," he discovered that plaintiff had ripped apart his mattress and covered the front of his cell. Dkt. #100-3, p. 10. When Fluman directed plaintiff to remove the mattress from the front of his cell, plaintiff did not respond. Dkt. #100-3, p. 10. Plaintiff then stated that he was "going to kill himself" several times, prompting a nurse to place him on suicide watch. Dkt. #100-3, p. 10; Dkt. #10, ¶ 54. Plaintiff was ultimately escorted off the block without incident, permitting defendant Fluman, in his words, to "continue[ ] on my count rounds." Dkt. #100-3, p. 10; Dkt. #10, ¶ 54. All of these events were memorialized in a second Inmate Misbehavior Report authored by defendant Fluman on July 8, 2010. Dkt. #100-3, p. 10.

---

[2] As per the Screening Order, Officer Diehr was terminated as a party to this action. Dkt. #3. Plaintiff amended his complaint to reflect this dismissal. Dkt. #10.

The following day, July 9, 2010, plaintiff was interviewed by L. Seymore, a social worker employed by the New York State Office of Mental Health ("OMH"), who works at Southport.  Dkt. #10, ¶ 55.  Upon Seymore's referral, plaintiff was transferred to Elmira Correctional Facility's satellite unit where he was housed in a special strip cell for observation and evaluation.  Dkt. #10, ¶ 56.  He returned to a level one cell in Southport on July 16, 2010.  Dkt. #112-1, ¶ 5.  Both of the July 8, 2010 Inmate Misbehavior Reports authored by Diehr and Fluman, respectively, were combined into one Tier III hearing, conducted by defendant Deputy Superintendent A. Bartlett. Dkt. #10, ¶ 58.

During the hearing, plaintiff's defense was not guilty by reason of mental disease or defect at the time of the incident, specifically, a suicidal breakdown. Dkt. #102, ¶ 12.  Plaintiff twice requested the testimony of Seymore, the social worker who referred him for psychiatric evaluation at Elmira's satellite unit.  Dkt. #102, ¶ 5. Bartlett instead took the confidential testimony of OMH Unit Chief D. Fuller.  Dkt. #100, ¶ 50; Dkt. #102, ¶¶ 7, 10.  Fuller initially testified that on July 9, 2010, plaintiff's thoughts were clear, organized, relevant, and coherent, but then reversed her testimony stating: "I apologize. [. . .] Insight and judgment were reported to be poor for circumstances at that time."  Dkt. #102, ¶ 11.  Fuller opined that plaintiff's health status at the time of the disciplinary incident "would not have affected his responsibility for his actions." Dkt. #100, ¶ 50; Dkt. #100-3, ¶ 16.  On the other hand, Fuller testified, "[plaintiff] has made positive efforts to avoid additional sanctions since his placement [at Southport], which should be considered."  She further opined:

> Although hanging his sheet in front of his cell and obstructing visibility was clearly a violation, his reported intention was to avoid additional problems with other inmates which evidents [sic] an attempt on his part to use a less aggressive mechanism for resolution.  Given his lengthy history of impulsivity and low threshold for frustration tolerance, some recognition of this effort may be warranted in considering the . . . consequences.

Dkt. #100-3, p. 14.  Plaintiff did not have an opportunity to cross-examine Fuller because her testimony was confidential.  Dkt. #112-1, ¶ 11.

Bartlett found plaintiff guilty of harassment, refusing a direct order (2 counts), threats, and visibility obstruction (2 counts), and not guilty of property damage or loss.  Dkt. #100-3, ¶ 18.  She imposed a 7-month SHU sentence (with 2 months suspended and 6 months deferred) to begin on January 26, 2011.  Dkt. #100-3, ¶ 19.

On October 5, 2010, Prack reversed and expunged Bartlett's hearing disposition in its entirety, because "there was no indication in the written record as to 'how' plaintiff's mental health was considered."[3]  Dkt. #100-3, ¶ 20, p. 44; Dkt. #102, ¶ 13.  Nevertheless, plaintiff claims that he suffered 18 days of shower deprivation (July 8, 2010 through July 25, 2010), and 12 days of cell clean up (July 8, 2010 through July 20, 2010).  Dkt. #102, ¶ 14.  He was also deprived of any outdoor exercise from July 8, 2010 to August 6, 2010, based on orders authorized by defendants Sheahan and Hetrick, Jr.  Dkt. #10, ¶¶ 86, 91; Dkt. #102, ¶¶ 16, 17.

---

[3] Under DOCCS' Directive No. 4832, a hearing officer is required to write in the statement of evidence relied upon how plaintiff's mental health was considered.  Dkt. #103, ¶ 8.

8

Plaintiff alleges that he went 18 days without a shower in mid-July while confined in a cell with no window or fan and no circulation of air because the entire front of the cell was covered with plexiglass.  Dkt. #112-1, ¶ 14.  Although he took "bird baths" in the sink, he developed pimples on his chest, crust on his scalp, grease in his hair, and raw skin on his genitalia and between his buttocks.  Dkt. #112-1, ¶ 14.

Defendants claim that the deprivation orders imposed between July 8, 2010 and July 15, 2010 had "no effect" because plaintiff "was not in DOCCS custody."  Dkt. #100-1, ¶ 27; Dkt. #100-12, pp. 5-6, ¶¶ 14, 15, 17.  Plaintiff contends that he was at all times in DOCCS custody because the satellite unit at Elmira is operated by correctional officers under "the auspice" of OMH.  Dkt. #112, ¶ 27.

After his outdoor exercise deprivation order was lifted on August 6, 2010, plaintiff remained on level one, which required that he once again be restrained with a waist chain and handcuffs while alone in the exercise cage.   Dkt. #112, ¶ 27(a); Dkt. #102, ¶ 32.  Plaintiff asserts that Southport's "exercise team" is instructed to cinch the waist chain tight enough that it is impossible to slide the waist chain down the legs and remove it from the body.  Dkt. #10, ¶ 73.  He contends that he was unable to engage in any meaningful exercise or even breathe properly while bound in this manner.  Dkt. #10, ¶¶ 75, 95.

Plaintiff asserts that he was also unable to exercise in his cell due to lack of space and poor ventilation made worse by the use of a plexiglass cell-shield which covered the front of his cell for 30 days straight.  Dkt. #102, ¶ 18.  Plaintiff's Southport cell measured 7' X 9'.  Dkt. #102, ¶ 21.  The metal bed frame, which was bolted to the wall, measured 6'8" X 2'10", and the metal desk, attached to the wall opposite the bed frame, measured 2'10" X 1'8".  Dkt. #102, ¶¶ 22-23.  The combination sink-toilet attached to the wall behind the desk measured, 3' X 2'.  Dkt. #102, ¶ 24.  This left a 3' X 6' area of free space.  Dkt. #102, ¶ 25.  The front of the cell was covered by a cell-shield and there were no windows in the cell.  Dkt. #102, ¶¶ 19-20.

Plaintiff contends that his exercise deprivation order was renewed week after week based on notations written in the "Daily Review" section of his "Deprivation Order Renewal Forms."  Dkt. #100-12, pp. 16-22; Dkt. #102, ¶ 26.  These forms contain numerous, cursory reports alleging that plaintiff was "uncooperative with staff," and "disruptive on gallery," often authored by the same corrections officer day after day, without any detail.  Dkt. #100-12, p. 18.  On July 15, 2010, the words "uncooperative with staff" appear in the "Daily Review" Section of the "Deprivation Order Renewal Form," but are struck out and followed by the letters "OMH."  Dkt. #100-12, p. 16; Dkt. #112-1, ¶ 26.  Plaintiff was not at the Southport facility on that date but was being evaluated at Elmira by OMH.  Dkt. #112-1, ¶ 26.  Defendants allege that plaintiff's deprivation order was reviewed on a daily basis and renewed only because of plaintiff's "continued uncooperative and disruptive conduct, as documented by security staff."

Dkt. #100-1, ¶¶ 29-30.  Plaintiff was given written notice of the grounds to renew his deprivation order, and he appealed each one.  Dkt. #100-1, ¶ 29; Dkt. #112, ¶ 29.

Captain Hetrick claims he renewed plaintiff's deprivation order because "his behavior constituted a threat to the safety or security of staff, inmates or State property and not for punishment or any illegitimate purpose."  Dkt. #100-8, ¶ 7.  Defendant Sheahan likewise claims that "plaintiff's recreation deprivation orders were only issued because of his continued uncooperative and disruptive conduct," and were renewed for "legitimate purposes."  Dkt. #100-12, ¶¶ 21, 23-24.

Plaintiff claims that the reports of his "disruptive" and "uncooperative" conduct were falsified by staff to sustain his deprivations as evidenced by the fact that there is no record of his misconduct in the cell block log book.  Dkt. #102, ¶ 26.  According to defendant Sheahan, any misbehavior on plaintiff's part would not be entered into the unit log "unless he was being deprived of a specific privilege," which of course, plaintiff was.  Dkt. #102, ¶ 29; Dkt. #112-1, ¶ 23.  There is not a single entry in the cell block log documenting misbehavior by plaintiff between July 9, 2010 and September 7, 2010, when he was subject to various deprivations followed by level one restraints.  Dkt. #102, ¶ 28; Dkt. #112-1, ¶ 24.  Plaintiff asserts that as a result of defendants' conduct, he went 61 consecutive days without exercise, which jeopardized his health.  Dkt. #102, ¶¶ 38-39.

With respect to Southport's mechanical restraint policy, plaintiff contends that then DOCCS Commissioner Fischer promulgated and authorized the policy, and thereby, treated plaintiff differently than other similarly-situated SHU inmates in DOCCS custody.  Dkt. #102, ¶¶ 33, 44-45.  Plaintiff asserts that the other supervisory defendants were personally involved for different reasons:  Griffin because he signed his name to, adopted, and incorporated the mechanical restraint policy into the Southport Operations Manual, and required all staff to review the mechanical restraint procedures (Dkt. #102, ¶ 34); Sheahan because he admitted that his job duties included assuring compliance with mechanical restraint procedures (Dkt. #102, ¶ 35); and Prack because he was responsible for the overall supervision of disciplinary procedures for DOCCS (Dkt. #102, ¶ 36).

Defendant Fischer, for his part, claims that he had only "general" knowledge of Southport's PIM's policies, and none of them were implemented during his tenure.  Dkt. #100-5, ¶¶ 7-9.  Griffin contends:  "I did not formulate the [mechanical policy] which instead [was] well established before my tenure as [Southport] Superintendent."  Dkt. #100-14, ¶ 5.  Sheahan claims that although he assured compliance with the restraint policies and authorized deprivation orders, he "did not formulate the policies which have long been in effect."  Dkt. #100-12, ¶ 8.  Of the level one mechanical restraint policy, Sheahan declared:  "I did not promulgate this policy or have any reason or authority to decline to enforce it."  Dkt. #100-12, ¶ 9.  "At times, some inmates, particularly those at Southport who are already facing long-term disciplinary confinement, continue to exhibit assaultive or other disruptive behavior,"

which "constitutes a threat to the safety or security of staff, inmates or state property"
and can justify orders of deprivation.  Dkt. #100-12, ¶¶ 12-13.  Prack contends that
"there would be no action he could have taken to prevent" plaintiff being placed in
mechanical restraints under the "local Southport SHU Policy."  Dkt. #100-10, ¶ 7.

Southport also allows inmates serving SHU time to act as company
"porters" and deliver meals to inmates who are restricted to their cells.  Dkt. #102,
¶¶ 62-63.  "Porters" are unsupervised on the company block.  Dkt. #102-1, p. 92.
Defendants contend that "the use of inmate porters dates back more than 20 years, and
inmates who demonstrate suitable behavior are eligible for work positions such as the
porter position while incarcerated."  Dkt. #100-1, ¶ 32.  "[I]nmate porters facilitate[ ] the
SHU operations in an economical manner as SHU inmates are confined to their cells."
Dkt. #100-1, ¶ 34.  Plaintiff contends that Southport porters routinely withheld food, and
extorted or otherwise abused inmates confined in their cells, but inmates rarely
complained for fear of retaliation.  Dkt. #104, p. 17.  Defendant Signor, Southport's
Correction Captain, admitted that prior to the events giving rise to this suit, he had
received complaints from inmates that they were not being fed by SHU porters.
Dkt. #112-2, ¶ 67.

On August 22, 2010, plaintiff wrote a letter which was forwarded to
Sheahan, Prack, Griffin, and Signor.  Dkt. #102-1, p. 48, 94, 96; Dkt. #112-2, ¶ 62-66.
In it, plaintiff expressed concerns about SHU porters withholding food and abusing him
because he was the only white inmate on the company.  Dkt. #102-1, p. 96;

Dkt. #112-2, ¶ 62, 66.  At that time, plaintiff had been to Southport on eight prior occasions.  Dkt. #102-1, pp. 132-133; Dkt. #112-2, ¶ 87.  Of his time in Southport, plaintiff wrote:  "I find myself continuously being the sacrificial lamb for the racial animosity between the black inmates and the white staff."  Dkt. #102, p. 91.  "The black porter . . . in charge of the food [is] under absolutely no supervision [a]nd I am defenseless locked in the cell."  Dkt. #102-1, p. 92.  Plaintiff requested to be moved "to D-block level 2 where all the cameras are [a]nd where staff issues the food" or to a level one gallery.  Dkt. #102-1, pp. 48, 92.  Sheahan and Prack responded to plaintiff's letter, Sheahan advising him to use the "established grievance mechanism or by writing to the superintendent," and Prack counseling plaintiff to "discuss his transfer concerns with [his] corrections counselor."  Dkt. #102-1, pp. 94, 96; Dkt. #112-1, ¶¶ 64-65.  On September 1, 2010, defendant Signor denied plaintiff's request for a transfer stating:  "at this time your request is based on the anticipation of an incident that may not occur."  Dkt. #102-1, p. 48.

Plaintiff contends that all that changed on November 5, 2010, when inmate Bernard Cooper, an unsupervised SHU porter on plaintiff's cell block, threw several cups of feces through the feed hatch into plaintiff's cell and onto his head, body, clothes, and property.  Dkt. #102, ¶ 75; Dkt. # 102-1, p. 116; Dkt. #112-2, ¶ 72.  Plaintiff claims that the assault occurred over 45 minutes and he put up a bed sheet to protect himself from being pelted with feces.  Dkt. #10, ¶ 140; Dkt. #102-1, p. 116; Dkt. #112-2, ¶ 94.

According to the certified "A-block" unit log book, while escorting a nurse on the cell block at approximately 7:15 p.m., officer Labar observed what appeared to be feces on the floor and on the bars of plaintiff's cell, and he notified defendant Sampsell, his Correction Sargent.  Dkt. #102-1, p. 103; Dkt. #112-2, ¶ 73.  At the time of Labar's initial report, there was no mention of feces being observed on the gallery.  Dkt. #112-2, ¶ 74.  It was at this point, plaintiff contends, that defendants Fluman, Labar, Sampsell, and Granger decided to "frame" plaintiff for throwing feces to retaliate against him for successfully appealing Fluman's July 8, 2010 misbehavior report.  Dkt. #112-2, ¶ 77.  Plaintiff claims that he was in the process of cleaning the feces off his head, face, and upper body, when defendants Sampsell, Granger, and Fluman came into plaintiff's cell, handcuffed him, took him out of his cell, and seated him in the day room.  Dkt. #112-2, ¶ 75.  As the three men stood over plaintiff, Fluman allegedly stated:  "I don't know how you go over on my ticket but you are going down for throwing shit tonight.  You fucked up my count."  Dkt. # 112-2, ¶ 76.

Plaintiff claims that at Fluman's urging and behest, Labar wrote plaintiff up for throwing feces on himself and his own property.  Dkt. #112-2, ¶ 78.  In his report, Labar alleged that he noticed that plaintiff had thrown something out of his cell, and determined by the "splash pattern" that plaintiff had thrown feces on his own cell gate.  Dkt. #112-2, ¶ 80.  The "A-block" log book entry states "8:05 p.m.: [a]fter reviewing the physical evidence it was Inmate Ruggiero . . . who had thrown feces on the gallery and on his own property."  Dkt. #102-1, p. 103.  Defendant Sampsell's memorandum regarding the incident reads as follows:

On 11-5-10 at approximately 7:10 p.m. I Sgt. Sampsell was notified of an unhygienic act in the A block on 12 gallery. I responded and found A-12-2 cell to have feces on the floor inside the cell gate and on the floor between the cell desk and bed. Some small amounts of feces were also found on the side of the desk, on the cell wall near the cell gate and on the bottom half of the cell gate. I checked the gallery from several angles finding only three Styrofoam cups which appeared to have milk in them on the floor directly beneath the feed up slot of A-12-2 cell. No splash pattern could be found on the gallery floor, walls or cell fronts. The gallery was dry and did not show any signs of being cleaned. I walked the gallery and did not smell any feces coming from any other area, no mops, buckets, towels or cups were seen. As inmate Ruggiero was removed I took a closer look at the feces in the cell noticing that the feces on the desk, bed sheets and cell wall appeared to have been poured on these objects and not thrown due to the lack of any splash pattern. Due to the lack of any splash patterns and the location of the feces it was determined that Inmate Ruggiero was responsible for the unhygienic act.

Dkt. #102-1, p. 107.

According to Labar, inmates at Southport frequently throw feces and it was neither a bizarre or abnormal occurrence. Dkt. #102, ¶ 71. Inmate Cooper, the man plaintiff claims threw feces on him, had an unhygienic act on his disciplinary record prior to his appointment as an unsupervised porter at Southport. Dkt. #102-1, p. 72; Dkt. #112-2, ¶ 71. Defendants Prack, Griffin, Sheahan, and Signor – the parties who oversee DOCCS special housing (Dkt. #100-10, ¶ 4), authorize deprivation orders, assign porters, and investigate inmate complaints regarding porters at Southport (Dkt. #100-8, ¶ 4; Dkt. #100-12, ¶ 8; Dkt. #100-12, ¶ 11; Dkt. #100-13, p. 2, ¶ 6) – contend that they were not aware that feces-throwing was epidemic at Southport. Dkt. #100-10, ¶ 8; Dkt. # 102-1, p. 72; Dkt. #112-2, ¶ 69. "Although unhygienic acts did happen at Southport," defendants attest, "they were not frequent incidents and were addressed accordingly with sanctions and removal of the inmate from the porter

position." Dkt. #100-1, ¶ 34; Dkt. # 100-12, ¶ 10; Dkt. #100-13, ¶ 5; Dkt. #100-14, ¶ 18.

Of the SHU porters, defendants claim that they "had no control whatsoever over

inmates throwing feces or denying meals." Dkt. #100-1, ¶ 33; Dkt. #100-10, ¶ 8;

Dkt. #100-12, ¶ 10.

Fluman claims that he "had nothing to do" with the issuance of the

November 5, 2010 misbehavior report and was "unaware of the disciplinary disposition"

of the July 8, 2010 misbehavior report or "any reversal thereof." Dkt. #100-6, ¶ 5.

Granger declared that "he has no recollection of the events at issue," and "had nothing

to do with the issuance of the November 5th misbehavior report or . . . July 8th

misbehavior report or the administrative reversal of which plaintiff alleges is the grounds

for the alleged retaliation." Dkt. #100-7, ¶ 4. Labar, who issued the report, contends

that it "was not false and I did not issue it for a retaliatory motive." Dkt. #100-9, ¶ 6.

Sampsell declared that he "made the good faith determination that plaintiff had thrown

feces in violation of inmate rules." Dkt. #100-11, ¶ 5.

On November 17, 2010, defendant Donahue conducted a Tier III hearing

on plaintiff's November 5, 2010 misbehavior report. Dkt. #112-2, ¶ 91. Plaintiff's

defense was that inmate Cooper had pelted plaintiff with feces and that Fluman and the

others "framed" him for throwing feces on himself and his own property. Dkt. #112-2,

¶¶ 91-92. Donahue took testimony from defendant Labar, who testified that there were

feces on the gallery, and that Fluman came with Sampsell to investigate. Dkt. #112-2,

¶ 93; Dkt. #102-1, pp. 113-14. When plaintiff attempted to ask Labar about inmate

Cooper, who plaintiff alleges threw the feces on him, Donahue stated:  "Officer Labar, we're not gonna answer questions concerning the other inmates."  Dkt. #102-1, p. 115. Donahue also denied as "really not relevant" plaintiff's question as to who notified the watch commander of the incident.  Dkt. #102-1, p. 115.  When plaintiff attempted to state his objection on the record, Donahue stated:  "I've determined it's not relevant.  If you continue to go on with this, I will remove you from the hearing.  Do you understand me?"  Dkt. # 102-1, pp. 115-16.

Plaintiff thereafter explained to Donahue his version of what transpired, that is:  plaintiff was set to be released from SHU on December 14, 2010; on the evening of November 5, 2010, the porter denied him his dinner tray; right before he was locked in for the night, the porter threw several cups of feces on plaintiff and in his cell; plaintiff hung up his blankets and sheets over the front of his cell to protect himself; the porter came back and tried to wrestle the sheet away; the officer announced nurse on rounds, and Labar came down the company with the nurse; several minutes later, Sargent Sampsell, CO Granger, and CO Fluman came to plaintiff's cell; plaintiff was in the process of cleaning feces off his head, face, and upper body; plaintiff was handcuffed; he asked for a shower but was denied; he was taken out of the cell and seated in the dayroom; Fluman told plaintiff:  "I don't know how you got over on my ticket, but you are going down for throwing shit tonight.  First thing, you fucked up my count," referring to July 8, 2010.  Dkt. # 102-1, p. 116.  Donahue replied to plaintiff's stated defense:  "[n]one of that has any bearing on this."  Dkt. #102-1, p. 116.

Plaintiff then called Sampsell as a witness.  Dkt. # 102-1, pp. 116-17.
Sampsell testified that when he arrived on the cell block, the gallery was dry, free from
any splash patterns or "anything for that matter."  Dkt. #112-2, ¶ 94.  He further testified
that there were two Styrofoam cups on the floor directly below the feed slot and a little
bit of water spilling from the cup.  Dkt. #102-1, p. 117.  "There w[ere] feces present but it
was inside the inmate's cell, on the floor inside the gate, and on the floor between the
desk and the bed."  Dkt. #102-1, p. 117.  Upon plaintiff's questioning, Sampsell testified:
"[s]heets and blankets were attached . . . in the corner at the top of the cell . . . and the
other part of the sheets were in the inmate's hands.  He was taking them down."
Dkt. #102-1, p. 118.

Sampsell testified that he notified the watch commander, but when plaintiff
attempted to question Sampsell further about inconsistencies between the A-block and
the watch commander logs, Donahue shut him down, stating:  "[i]t's really not relevant,
okay?"  Dkt. #102-1, p. 118.  When plaintiff asked Sampsell, "if I threw feces out of my
cell . . . wouldn't it be, you know, scattered away from my cell?," Donahue shut down
plaintiff's line of questioning stating:  "[y]ou're not asking hypothetical questions."
Dkt. # 102-1, p. 119.  Thereafter, when plaintiff referred to the entries from the "A-block"
and watch commander's log, Donahue stated, "[w]hy don't we just read them into the
record, since you want to keep talking about them like they're some magic."
Dkt. #102-1, p. 120.  Plaintiff objected to Donahue's attitude and demeanor as "biased,"
to which Donahue replied:  "[i]f you continue like that and interrupt me one more time[,] I
will remove you from this hearing."  Dkt. #102-1, p. 120.  When plaintiff objected a

second time, Donahue told plaintiff:  "[do]n't speak . . . [i]f you speak you will not be here

for the remainder of this hearing."  Dkt. #102-1, p. 120.

Donahue then read from the "A-block" log which indicated: "7:15 p.m.,

while escorting the nurse, Officer Labar observed what appeared to be feces on the

floor . . .  8:05 p.m.; after reviewing the physical evidence, it was inmate Ruggiero  . . .

who had thrown the feces . . . ."  Dkt. #102-1, p. 120-21.  "The Watch Commander log

book states, 7:10 p.m., Watch Commander notified, inmate Ruggiero . . . has spread

feces in his own cell.  OD, DSP Bartlett authorizes shield, deprivation and pre-hearing

diet."  Dkt. #102-1, p. 120.  The hearing proceeded as

follows:

| | |
|---|---|
| *Ruggerio*: | Okay.  If the . . . physical evidence wasn't reviewed until 8:05, how [does] the log of the Watch Commander at 7:10 [say] to put me on the loaf?" |
| *Donahue*: | Okay, one more time.  I'm not answering hypothetical questions |
| *Ruggiero*: | It's not a hypothetical question.  You just read it into the record.  7:10 p.m. . . . |
| *Donahue*: | No, but when you ask how, that makes it a hypothetical. |
| *Ruggiero*: | Because you refuse to let me ask the witness.  How can you review evidence at 8:05, but yet the Watch Commander log book entry says 7:10? |
| *Donahue*: | Okay.  The facts are the facts.  Do you have any other testimony or evidence? |
| *Ruggiero*: | Yes I do. |
| *Donahue*: | Present it now. |

*Ruggiero*:     Back to the log entries where he states; 8:05 p.m. (this is the A-block logbook entry); physical evidence, it was allegedly me who had thrown feces on the gallery then onto my own property? So, wait. I'm gonna throw shit on my sheets and blankets that I'm gonna have to sleep in that night. Right? I like my property. I like my books. I spend . . .

*Donahue*:     Okay. None of this is relevant.

Dkt. #102-1, p. 121.

Plaintiff then called Officer Fluman as a witness. Dkt. #102-1, p. 121. After a brief break "to get Fluman's testimony," the hearing resumed with Donahue denying Fluman as a witness. Dkt. #102-1, p. 122. "Ruggiero," Donahue stated, "at this point, I'm gonna tell you that I am denying Officer Fluman as a witness as I'm deeming his testimony . . . redundant to that of Officer Labar and Sargent Sampsell who've already testified." Dkt. #102-1, p. 122. Plaintiff objected given the discrepancy in Labar and Sampsell's testimony, to which Donahue replied: "[a]nd I've already made my decision that that would be redundant." Dkt. #102-1, p. 122. Another witness, an inmate who was housed in the cell next to plaintiff's on November 5, 2010, refused to testify indicating on a form that "he did not want to be involved." Dkt. #102-1, p. 123. In closing, plaintiff objected to Donahue's conduct in refusing to allow plaintiff to question Labar and Sampsell, telling plaintiff to stop when he tried to state his defense, and threatening numerous times to kick him out of the hearing. Dkt. #102-1, pp. 124-25.

After the close of evidence, Donahue took approximately 12 minutes to consider the evidence, made a written deposition (which he read into the record) finding plaintiff guilty of committing an unhygienic act.  Dkt. # 102-1, p. 125.  In so doing, Donahue explicitly credited Labar's report and testimony, the supporting testimony of Sampsell, and "the log book entries which support the report."  Dkt. #102-1, p. 125. Donahue imposed the following sentence on plaintiff:  6 months SHU time (3 months suspended and 6 months deferred), thereby extending plaintiff's release date from December 14, 2010 to March 14, 2011;[4] 3 months recommended loss of good time; 7 days restricted diet (3 days suspended and 6 months deferred).  Dkt. #102-1, p. 125; Dkt. #112-2, ¶ 100.  On appeal, defendant Prack modified plaintiff's sentence by removing the 3 days restricted diet, which Donahue had imposed "suspended." Dkt. #112-2, ¶ 106.  In modifying the sentence, Prack stated "the nature of the offense does not warrant the penalty imposed."  Dkt. #100-4, p. 45.

It is undisputed that prior to his determination, plaintiff had no disciplinary history of unhygienic acts.  Dkt. #102-1, pp. 135-36; Dkt. #112-2, ¶ 88.  Rather, it was Inmate Cooper, the SHU porter, with a history of such conduct.  Dkt. #112-2, ¶ 89.

Defendant Donahue contends that it is "evident" from the hearing transcript that he conducted the disciplinary hearing in a "fair and impartial manner" and he afforded plaintiff "all the due process he was entitled to under applicable constitutional principles."  Dkt. #100-4, ¶ 4.  "Due to the sheer amount of hearings that

---

[4] At the time of the feces-throwing incident on November 5, 2010, plaintiff had only 42 days left to be released from SHU, having received a "time-cut" on October 20, 2010.  Dkt. #112-2, ¶ 90.

take place in the prison setting, it is necessary to reduce the number of redundant testimonies in order to keep the efficacy of the process in motion." Dkt. #100-4, ¶ 11. Plaintiff's "hypothetical" questions about the log books, Donahue opined, "clearly seemed like an effort to stall and further delay the hearing." Dkt. #100-4, ¶ 13. "I was not biased nor did I determine plaintiff's guilt prior to the hearing." Dkt. #100-4, ¶ 18. "In no way was [plaintiff] treated unfairly or stopped from presenting relevant evidence or testimony." Dkt. #100-4, ¶ 17.

At the time that plaintiff began his sentence for committing an "unhygienic act," he had been in SHU for 334 consecutive days. Dkt. #112-2, ¶ 101. The 3-month SHU sentence imposed by Donahue began on December 14, 2001 and continued until March 14, 2010, resulting in an aggregate sentence of 424 days of SHU confinement. Dkt. #112-1, ¶ 102. As a result of his guilty disposition, plaintiff was deprived of outdoor recreation for 24 days, showers for 12 days, cell clean-up for 5 days, and subjected to a restricted diet for 11 days as well as the cell-shield. Dkt. #112-2, ¶¶ 103, 108-111, 115.

Defendants Bartlett and Sheahan renewed plaintiff's deprivations based on negative "Daily Review" notations from staff indicating plaintiff was "disruptive on gallery," "uncooperative with staff," "ignore[d] staff direction," and exhibited a "poor demeanor toward staff." Dkt. #102-1, pp. 138-41. Plaintiff contends that, like before, these notes were falsified to sustain his deprivations. Dkt. #112-2, ¶ 111-12. Bartlett contends that she renewed plaintiff's deprivation order because "his behavior constituted a threat to the safety or security of staff, inmates or state property and not

for punishment or any illegitimate purpose." Dkt. #109-2, ¶ 5. Again there were no entries in the unit logs documenting misconduct by plaintiff during the period that he was being deprived. Dkt. #112-2, ¶¶ 113-14. After plaintiff's outdoor exercise was restored, he was again subject to the level one mechanical restraint policy from November 29, 2010 through January 3, 2011, approximately 36 days. Dkt. # 112-1, ¶ 116.

Regarding the use of SHU porters, plaintiff asserts the following basis for defendants' personal involvement: Griffin promulgated the policy of allowing inmates serving SHU time to act as company porters to serve food to inmates (Dkt. #102, ¶¶ 62, 63); Sheahan assisted in assigning inmates to porter jobs (Dkt. #102, ¶ 64); and Signor vetted complaints from inmates regarding SHU porters (Dkt. #112-2, ¶ 67). Griffin contends: "I did not formulate the [SHU porter policy] which instead [was] well established before my tenure as [Southport] Superintendent." Dkt. #100-14, ¶ 5. Signor asserts that he did not implement the policy of using SHU porters, rather, "the utilization of SHU porters was instituted on or about December 1990, twenty years before the plaintiff's complaint arose." Dkt. #100-13, ¶ 7. Defendant Prack claims that he "did not formulate the . . . longstanding poli[cy]" of using inmate porters nor did he "have any reason to decline to enforce [it]." Dkt. #100-10, ¶ 9.

Mr. Ruggiero exhausted his administrative remedies (Dkt. #10, ¶¶ 115-21, 228-38) and thereafter commenced this *pro se* action pursuant to 42 U.S.C. § 1983, alleging violations of his rights under First, Eighth, and Fourteenth Amendments of the

United States Constitution.  He has asked for a declaratory relief as well as punitive and compensatory damages.  Dkt. #10, ¶¶ 241-44.  As noted above, defendants have moved for summary judgment against all of causes of action in plaintiff's complaint and plaintiff has cross-moved for summary judgment.

## DISCUSSION AND ANALYSIS

**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted).  A party seeking to defeat a motion for summary judgment:

> must do more than make broad factual allegations and invoke the appropriate statute.  The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).[5]


**42 U.S.C. § 1983**

Plaintiff brings his complaint under 42 U.S.C. § 1983, which provides a civil claim for damages against "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (internal citations omitted).  To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must establish that a person acting under color of state law deprived him of a federal right.  *Id.*  Here, plaintiff claims that defendants

---

[5] Defendants did not reply to each of plaintiff's undisputed facts individually, but in groups. Dkt. #109-1.  In this respect, defendants did not strictly comply with the requirements of Local Rule of Civil Procedure 56(a)(2).  This Court nonetheless declines to admit all of plaintiff's facts as he requests, because they are not truly undisputed or uncontroverted.

violated his rights under the First, Eighth, and Fourteenth Amendments to the

Constitution of the United States.  Dkt. #10.


**Due Process Claims**

*Due Process in the Prison Context*

      "To prove a violation of due process, a plaintiff must establish that:  (1) he

possessed a liberty interest; and (2) defendants deprived him of that interest without

sufficient process."  *Walker v. Fisher,* 523 F. App'x. 43, 44 (2d Cir. 2013) (citing *Giano v.*

*Selsky,* 238 F.3d 223, 225 (2d Cir. 2001)); *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.

2004).  An inmate's protected liberty interest is implicated only where the conduct at

issue imposes an "atypical and significant hardship on the inmate in relation to the

ordinary incidents of prison life."  *Sandin v. Conner,* 515 U.S. 472, 484 (1995).


      State statutes and regulations do not create federally protected due

process rights; rather, the only process due an inmate is the minimal process

guaranteed by the Constitution.  *Wolff v. McDonnell*, 418 U.S. 539, 564-70 (1974);

*Shakur v. Selsky,* 391 F.3d 106, 119 (2d Cir. 2004).  Simply put, "federal law, not state

regulations, determines the procedures necessary to protect that liberty interest."

*Blouin v. Spitzer,* 356 F.3d 348, 363 (2d Cir. 2004) (citing cases).  For this reason, "the

*only* relevant inquiry [is] whether constitutional 'minimal procedures' [for the loss of a

protected liberty interest] were met, not whether state procedures were followed."

*Shakur,* 391 F.3d at 119; *Cepeda v. Urban*, No. 12-CV-408 (F), 2014 WL 2587746, at *9

(W.D.N.Y. June 10, 2014).

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer," *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir. 1996), who does not "prejudge the evidence." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990).  At the same time, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts," and "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,* 100 F.3d at 259 (citing cases).  Not only are prison disciplinary hearing officers accorded greater flexibility, the due process impartiality standard is satisfied if "some evidence" in the record supports the prison officer's disciplinary decision. *Superintendent v. Hill,* 472 U.S. 445, 455-56 (1985); *see also Zavaro v. Coughlin*, 970 F.2d 1148, 1152 (2d Cir. 1992).

Procedurally, an inmate facing disciplinary proceedings must be provided with "written notice of the charges against him," "a brief period of time" to prepare his defense, and a "written statement by the fact finder as to the evidence relied on and reasons for the disciplinary action." *Wolff*, 418 U.S. at 564-65 (internal citations omitted).  The inmate must also "be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566.  Consistent with this right, a judicial officer may not refuse to interview a requested witness without assigning a valid reason. *Ayers v. Ryan*, 152 F.3d 77, 81 (2d Cir. 1998).

*July 2010 Hearing (Bartlett)*

Plaintiff asserts a liberty interest in receiving one hour of exercise per day and the ability to shower two times a week and to clean his cell three times a week. *See* 7 NYCRR 304.3, 304.5(a), 304.5(e).  Plaintiff was denied outdoor recreation for 30 days, returned to mechanical restraints for an additional month, deprived of showers for 18 days, and cell clean-up for 12 days. [6] [7] [8] Dkt. #10, ¶ 92.  Plaintiff claims that he was denied due process when Bartlett failed to call L. Seymore, the OMH social worker who evaluated him after his suicide threat, and thereby undermined his defense of not guilty by reason of mental disease or defect.  Dkt. #100-3, pp. 15, 30; Dkt. #102, ¶ 5.

Presuming (without finding) that the collective deprivations imposed on plaintiff amounted to an "atypical" hardship, this Court finds that Bartlett provided plaintiff with sufficient process at his July 2010 hearing.  The hearing transcript reveals that Bartlett took the testimony of several witnesses at plaintiff's request, including Nurse Miller, who put plaintiff on suicide watch on July 8, 2010.  Dkt. #100-3, ¶¶ 11, 13-15.  Although she allowed Nurse Miller's factual testimony that plaintiff threatened to kill himself, Bartlett concluded that Miller was not trained to opine on plaintiff's mental capacity at the time of the incident.  Dkt. #100-3, p. 23.  "I will get your mental health status from mental health staff that are trained to do that," Bartlett stated.  Dkt. #100-2, p. 23.  When plaintiff requested Seymore later in the proceedings, Bartlett assured

---

[6] The parties disagree as to whether plaintiff was subject to deprivations between July 8, 2010, and July 15, 2010, when he was in the custody of the Office of Mental Health.  This factual dispute is discussed in greater depth below.

[7] Plaintiff's Eighth Amendment claims relating to the denial of showers and cell cleaning supplies as a result of the July 8, 2010 hearing were dismissed in the Screening Order.  Dkt. #3, pp. 10-11.  However, the Screening Order did not reach the question of whether these deprivations amounted to an "atypical and significant hardship" for purposes of plaintiff's due process claim.

[8] Bartlett's imposition of SHU time was ultimately reversed before it was set to begin.

plaintiff, "I will be getting confidential OMH testimony . . . about your state of mind," to which plaintiff responded, "Alright." Dkt. #100-3, p. 30.

Shortly thereafter, D. Fuller, the Chief of the OMH Unit, gave confidential testimony apparently using Seymore's contemporaneous treatment notes.  Dkt. #100-3, p. 13.  Fuller corrected herself once during her testimony regarding defendant's mental state on July 9, 2010, but ultimately testified that plaintiff "presented as angry," "reported suicidal ideation," and that his "insight and judgment were . . . poor for the circumstances at that time."  Dkt. #100-3, p. 13; Dkt. #111, p. 25.  Fuller opined that plaintiff's mental status at the time of the disciplinary incident "would not have affected his responsibility for his actions," but noted that plaintiff had been in SHU for nearly 8 months and had made positive efforts to avoid additional sanctions.  She testified that although putting a sheet in front of his cell was a violation, it was also "an attempt on his part to use a less aggressive mechanism for resolution" of his problems with other inmates.  Dkt. #100-3, p. 14.  Fuller urged Bartlett to recognize plaintiff's efforts to avoid confrontation with his fellow inmates in deciding plaintiff's "consequences."  Dkt. #100-3, p. 14.

In the view of this Court, Fuller was a qualified witness who testified ably, if imperfectly, regarding plaintiff's mental state on July 8, 2010.  Fuller demonstrated knowledge of plaintiff's mental history, his institutional adjustment, his disciplinary record, and the facts surrounding his alleged misbehavior.  She advocated for leniency in imposing any punishment against plaintiff.  Given Fuller's apparent qualifications and

preparation, it cannot be said that Bartlett violated plaintiff's due process right by taking Fuller's testimony rather than Seymore's.

Plaintiff argues that Bartlett failed to specify in the statement of evidence relied upon "how" she considered plaintiff's mental health as required by 7 N.Y.C.R.R. 254.6(f).  In reading her written disposition into the record, Bartlett merely noted that:  "[c]onfidential OMH testimony was also taken into consideration in establishing the inmate's frame of mind during these incidents and in giving sanctions."  Dkt. #100-3, p. 36.  This explanation falls short of what is required by 7 N.Y.C.R.R. 254.6(f).  However, a violation of 7 N.Y.C.R.R. 254.6(f), without more, does not establish Bartlett's liability under 42 U.S.C. § 1983.  *See Patterson v. Coughlin,* 761 F.2d 886, 891 (2d Cir. 1985) (holding that a "state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983"); *Cepeda*, 2014 WL 2587746, at *6.

For this reason, summary judgment is granted in favor of defendant Bartlett on plaintiff's due process claim relating to the July 2010 hearing and plaintiff's cross-motion on that claim is denied.

*Substantive Due Process Retaliation Claim (Sampsell, Labar, Granger and Fluman)*

While an inmate has no constitutional protection against false accusations, he does have a substantive due process right not to be retaliated against for exercising his constitutional rights.  *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir. 1995); *Franco*

*v. Kelly,* 854 F.2d 584, 589-90 (2d Cir. 1988).  Because claims of retaliation can be

invoked with "relative ease," *Cannon v. Wood*, No. 9:10-CV-01332 (GTS/RFT), 2013

WL 838299, at *4-6 (N.D.N.Y. Jan. 22, 2013), *report and recommendation adopted,*

No. 9:10-CV-1332 (GTS/RFT), 2013 WL 838294, at *3 (N.D.N.Y. Mar. 6, 2013), courts

should examine such claims "with skepticism and particular care."  *Colon v. Coughlin,*

58 F.3d at 872 (citation omitted); *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir. 2001)

(stating that "virtually any adverse action taken against a prisoner by a prison official -

even those otherwise not rising to the level of a constitutional violation - can be

characterized as a constitutionally proscribed retaliatory act"), *overruled on other*

*grounds  by Swierkewicz v. Sorema,* 534 U.S. 506 (2002); *see also Graham v.*

*Henderson,* 89 F.3d 75, 79 (2d Cir. 1996).


To establish a First Amendment retaliation claim, an inmate must

show that:  (1) he was engaged in constitutionally protected activity; (2) the defendants

took adverse action against the plaintiff; and (3) there was a causal connection between

the protected activity and the adverse action in that the alleged conduct was

substantially motivated by the protected activity.  *Gill v. Pidlypchak,* 389 F.3d 379, 380

(2d Cir. 2004).  The plaintiff bears the initial burden to show that the defendant's actions

were improperly motivated.


To satisfy the second prong, a prisoner must present evidence from which

a court could infer that defendants acted with an improper motive.  A plaintiff may meet

this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating

the need for direct evidence.  Such evidence may include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their motive for the discipline.  *See Colon,* 58 F.3d at 872-73; *see also Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir. 2003) (holding that plaintiff met his burden by presenting circumstantial evidence that defendant correctional officers filed disciplinary charges against him just as he was settling a lawsuit against the correctional facility and the disciplinary charges were subsequently reversed as unfounded).

"Adverse action" is retaliatory conduct "that would deter a similarly situated individual of ordinary firmness" from exercising his constitutional rights. *Barrington v. New York*, 806 F. Supp. 2d 730, 745 (S.D.N.Y. 2011) (internal citations omitted).  If it would not, the retaliatory act is *"de minimis* and therefore outside the ambit of constitutional protection."  *Dawes,* 239 F.3d at 493.

Here, plaintiff has presented evidence that:  (1) he successfully appealed the adverse disciplinary finding based on Fluman's July 2010 misbehavior report; (2) defendants Fluman, Labar, Granger, and Sampsell conspired to "frame" him for throwing feces on November 5, 2010; and (3) they did so because plaintiff "got over on [Fluman's] ticket" and "fucked up [his] count."  Dkt. #104, p. 20.  There are facts in this record from which a reasonable juror could infer that defendants acted with improper motive in filing the November 5, 2010 misbehavior report:  first, the disciplinary finding

was reversed on October 5, 2010, only one month prior to the second misbehavior report; second, plaintiff's July 8, 2010 misbehavior occurred during Fluman's "count rounds" and Fluman's statement that plaintiff was "going down for throwing shit tonight" because he "fucked up [Fluman's] count;" third, plaintiff had no other disciplinary reports filed against him between July and November 2010; and fourth, it was unlikely that plaintiff would throw feces on himself and his belongings.  Also in dispute is whether plaintiff asked for and was denied a shower, facts which are relevant to defendants' motives.

Defendants, for their part, dispute that they acted with retaliatory motives or that they even knew about the prior disciplinary finding being reversed.  Dkt. #100-6, ¶ 5; Dkt. #100-7, ¶ 4; Dkt. #100-9, ¶ 6; Dkt. #100-11, ¶ 5.  On this record, there are genuine issues of fact as to whether Fluman knew about the reversal, whether he threatened plaintiff for "getting over on [his July 8, 2010] ticket," and whether Labar, Granger, and Sampsell had a "meeting of the minds" with Fluman to retaliate against plaintiff.  These disputed facts are material to whether the defendants acted with retaliatory motives and preclude summary judgment for either plaintiff or defendants.

## November 2010 Hearing (Donahue)

"Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*."  *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir. 2000); *see also Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir. 2000) (holding that the plaintiff's

sentence of one year was "of sufficient length to be atypical and significant").  At the

time that plaintiff began his 3-month SHU sentence imposed by Donahue, plaintiff had

already served 334 days in SHU.  By the time he was done serving those three months

on March 14, 2010, he had been confined in SHU for 424 days.  This aggregate

punishment is sufficiently "atypical and significant" to implicate the protections of the

due process clause.  *Giano*, 238 F.3d at 226 (holding that separate SHU sentences

"should be aggregated for purposes of the *Sandin* inquiry" when they constitute a

sustained period of confinement); *Sealey v. Giltner*, 197 F.3d 578, 588 (2d Cir. 1999)

(reasoning that "[w]herever the point is beyond which confinement in harsh conditions

constitutes atypicality, a prison official must not be permitted to extend such

confinement beyond that point without according procedural due process").


This Court finds that Donahue prejudged the evidence against plaintiff,

prevented him from questioning Labar and Sampsell about matters directly relevant to

his defense under threat of being removed from the hearing, and failed to provide a

valid reason for not calling Fluman as a witness.  Plaintiff's defense to the charge of

committing an unhygienic act was that:  inmate Cooper, the company porter, assaulted

plaintiff by throwing several cups of feces into his cell; plaintiff tried to defend himself by

putting sheets over the front of his cell; and Fluman convinced Labar, Granger, and

Sampsell to frame plaintiff for "throwing shit" in retaliation for successfully appealing

Fluman's July 8, 2010 "ticket."  When plaintiff stated his defense on the record,

Donahue stated:  "[n]one of that has any bearing on this."  Dkt. #102-1, p. 116.

This set the stage for the remainder of the hearing, preemptively excluding any inquiry into inmate Cooper's conduct, the "A-block" and watch commander's log books, the feces pattern, and plaintiff's motives.  When plaintiff attempted to question Labar about inmate Cooper, Donahue shut him down saying:  "we're not gonna answer questions about the other inmates."  Dkt. #102-1, p. 115.  Plaintiff inquired how, if Labar did not see plaintiff throw something from his cell until 7:15 and the defendants did not review the physical evidence until 8:05 p.m. (according to the "A-block" log), the watch commander was notified that plaintiff had committed a violation and placed plaintiff on a pre-hearing restricted diet at 7:10 (according to the watch commander's log).  This question prompted Donahue to state:  "I'm not answering hypothetical questions."  Dkt. #102-1, p. 121.  And later in the hearing, Donahue asserted that the inconsistencies between the log books were "really not relevant . . ."  Dkt. #102-1, p. 118.  When plaintiff pressed the issue of the log books, Donahue stated, "[w]hy don't we read them into the record since you want to keep talking about them like they're some magic."  Dkt. #102-1, p. 120.

Throughout the proceeding, Donahue did little to disguise his contempt for plaintiff.  Any attempt by plaintiff to object was met with threats to remove plaintiff from the hearing.  When plaintiff objected to Donahue's demeanor as "biased," Donahue's terse response was:  "[d]on't speak."  Dkt. #102-1, p. 120.

With respect to the key physical evidence, plaintiff asked Sampsell:  "if I threw feces out of my cell . . . wouldn't it be, you know, scattered away from my cell?," Donahue shut down this legitimate line of questioning stating:  "[y]ou're not asking hypothetical questions."  Dkt. #102-1, p. 119.  Plaintiff then questioned what possible motive he would have to "throw shit on my sheets and blankets that I'm gonna have to sleep in that night," to which Donahue replied:  "[n]one of this is relevant."  Dkt. #102-1, p. 121.  Finally, Donahue denied plaintiff's request to call Fluman as a witness, concluding that his testimony would be "redundant" to that of Labar and Sampsell, despite the fundamental inconsistency between the testimonies given by those two witnesses about the feces pattern.

Even acknowledging the greater flexibility afforded to disciplinary hearing officers, this Court does not agree with Donahue's self-assessment that he was "fair and impartial."  Dkt. #100-4, ¶ 4.  To the contrary, this Court finds that Donahue prevented plaintiff from offering relevant evidence regarding inmate Cooper, the log books, and the feces pattern, and conducted the hearing in such a biased manner as to violate plaintiff's due process rights.  For this reason, plaintiff's motion for summary judgment against Donahue is granted as to liability and defendants' motion is denied.

**Eighth Amendment Claims**

*Eighth Amendment in the Prison Context*

"[W]hen the state takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999). The Eighth Amendment, which applies to the states through the Due Process Clause of the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes. U.S. Const. Amend. VIII; *Wilson v. Seiter*, 501 U.S. 294, 297-98 (1991). A prisoner's conditions of confinement fall within the ambit of the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).

To prevail on an Eighth Amendment claim, an inmate must satisfy both an objective and subjective element. To meet the objective element, the inmate must demonstrate that the conditions of his confinement resulted in "unquestioned and serious deprivations of basic human needs" or otherwise deprived him of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347. Subjectively, an inmate must show that defendants acted with "deliberate indifference" to his health or safety. *Trammell v. Keane*, 338 F.3d 155, 162-63 (2d Cir. 2003). Generally speaking, "[a] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate safety.'" *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). That is, "the official must be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

When the prison conditions complained of are the result of disciplinary sanctions, the "deliberate indifference standard must be applied in a way that accounts for the precise circumstances of the alleged misconduct and the competing institutional concerns." *Trammell*, 338 F.3d at 163.  Put another way, the court must determine whether the deprivation order "was reasonably calculated to restore prison discipline and security and, in that . . . context, whether the officials were deliberately indifferent to [plaintiff's] health and safety." *Id.*

### *Deprivation of Outdoor Exercise and Return to Mechanical Restraints,*[9]*July through September 2010 (Fischer, Prack, Griffin, Sheahan and Hetrick)*

Plaintiff contends that Sheahan and Hetrick authorized the exercise deprivation imposed by Bartlett, and that Fischer, Prack, and Griffin continued the mechanical restraint policy to which plaintiff was summarily returned after the deprivation order was lifted.  Dkt. #10, ¶¶ 65-72, 93-94.  Plaintiff was denied all outdoor exercise between July 8, 2010 and August 6, 2010, a total of 30 days, and was immediately thereafter subject to mechanical restraints inside the exercise cage until September 7, 2010, an additional 31 days.  Dkt. #10, ¶ 93.  For the following reasons, this Court finds that genuine issues of material fact exist that preclude summary judgment for either party on this claim.

"[E]xercise is one of the basic human needs protected by the Eighth Amendment."  *Williams v. Goord (Williams I)*, 111 F. Supp. 2d 280, 292 (S.D.N.Y. 2000) (citing *William v. Greifinger,* 97 F.3d 699, 704 (2d Cir. 1996)).  That being said, a

---

[9] Plaintiff's Eighth Amendment Claims relating to his 18-day shower deprivation and 12-day cell-cleaning supply deprivation were dismissed with prejudice by the Screening Order.  Dkt. # 3, pp. 10-11.

deprivation of exercise amounts to a constitutional violation only where an inmate is denied "all meaningful exercise" for a substantial period of time.  *See Davidson v. Coughlin*, 968 F. Supp. 121, 129 (S.D.N.Y. 1997).  In determining whether an exercise deprivation rises to this level, a court may consider:  (1) the duration of the deprivation; (2) the extent of the deprivation; (3) the availability of other out of cell activities; (4) the opportunity for in-cell exercise; and (5) the justification for the deprivation.  *See Williams I*, 111 F. Supp. 2d at 291; *Amaker v. Goord*, No. 98 Civ. 3634(JGK), 1999 WL 511990, at *6 (S.D.N.Y. July 20, 1999) (citing *Davidson*, 968 F. Supp. at 130).

Regarding the duration, courts have granted judgment in favor of a prisoner where "the magnitude of the deprivation of exercise was patent." *Williams v. Goord (Williams II)*, 142 F. Supp. 2d 416, 425 (S.D.N.Y. 2001); *Williams v. Greifinger,* 918 F. Supp. 91, 98 (S.D.N.Y. 1996) (holding that plaintiff was entitled to summary judgment on his Eighth Amendment claim because he was deprived exercise for 589 days), *rev'd on other grounds by Williams v. Greifinger*, 97 F.3d at 699; *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996) (upholding a preliminary injunction requiring prison officials to release inmate from medical keep lock when he was allowed out of his cell for only 10 minutes per week for over 3 and 1/2 years); *see also Allen v. Sakai,* 48 F.3d 1082, 1086-88 (9th Cir. 2010) (affirming the district court's denial of qualified immunity where inmate was allowed only 45 minutes of outdoor recreation per week for six weeks and his segregation was infinite); *Mitchell v. Rice*, 954 F.2d 187, 192 (4th Cir. 1992) (holding that qualified immunity is not appropriate because a reasonable official

should have known that depriving an inmate of out of cell exercise for several months would violate the Eighth Amendment).

On the other hand, courts have held that depriving a prisoner of exercise for a relatively brief period of time does not violate the Eighth Amendment. *See, e.g., Branham v. Meachum*, 77 F.3d 626, 630-31 (2d Cir. 1996) (holding that keeping plaintiff on full restraint status without outdoor recreation for 22 days does not state an Eighth Amendment claim); *Green v. Ferrell*, 801 F.2d 765, 771-72 (5th Cir. 1986) (holding that the policy of denying inmates out of cell exercise for first 15 days of punitive confinement did not violate the Eighth Amendment); *Riddick v. Arnone*, No. 3:11cv631 (SRU), 2012 WL 2716355, at *5 (D. Conn. July 9, 2012) (concluding that denial of exercise for 10 days is *de minimis* and does not rise to the level of an Eighth Amendment violation); *Houston v. Goord*, No. 9:03cv1412 (GTS/DEP), 2009 WL 890658, at *4 (N.D.N.Y. Mar. 31, 2009) (holding plaintiff's Eighth Amendment claim not cognizable because the denial of outdoor activity for less than two weeks was *de minimis*); *Shakur v. Sieminski*, 3:07cv1239 (CFD), 2007 WL 2151174, at *5 (D. Conn. July 15, 2007) (stating that "[a]lthough the Second Circuit has approved one hour of outdoor recreation per day, it has not held that amount to be the constitutional minimum") (internal citations omitted); *Gibson v. City of New York*, No. 96 CIV. 3409 (DLC), 1998 WL 146688, at *3 (S.D.N.Y. Mar. 25, 1998) (holding that denying plaintiff prisoner's right to exercise for 8 days in a 60-day period does not violate the Eighth Amendment); *Davidson*, 968 F. Supp. at 131 (holding that deprivation of exercise for 14 days did not violate the Eighth Amendment); *Arce v. Walker*, 907 F. Supp. 658, 662-63

(W.D.N.Y. 1995) (holding that defendants did not violate the Eighth Amendment by

denying an inmate in administrative confinement out-of-cell exercise for 18 out of 19

days), *affirmed in part and vacated in part by Arce v. Walker*, 139 F.3d 329, 338 (2d Cir.

2014).

On this record, there exist genuine issues of material fact relating to the

duration, extent, and justification for plaintiff's exercise deprivation, and to his

opportunity for in-cell exercise.  Regarding duration, defendants contend that the order

depriving plaintiff of outdoor exercise between July 8, 2010 and July 15, 2010 had "no

effect" because plaintiff was not at Southport but at Elmira Correctional Facility being

evaluated by OMH.  Dkt. #100-1, ¶ 27.  Plaintiff asserts that he was in DOCCS custody

and subject to the deprivation order because the OMH unit at Elmira is operated by

DOCCS correctional officers under "the auspice" of OMH.  Dkt. #112, ¶ 27.  With

respect to the extent of the deprivation, this Court must determine whether being bound

in mechanical restraints deprived plaintiff of engaging in any meaningful exercise in the

exercise cage, an issue not to be determined on a motion for summary judgment.  *See*

*Williams II*, 142 F. Supp. 2d at 426-27 (denying summary judgment where the parties

offered competing testimony about what aerobic exercises plaintiff could perform while

in handcuffs and waist chain restraints).

Also in dispute is whether plaintiff's deprivation orders and the renewals

were, in fact, justified by "disruptive" and "uncooperative" conduct on plaintiff's part or if

the negative reports of plaintiff's behaviors in the "Daily Review" section of the

"Deprivation Order Renewal Forms" were falsified.  Dkt. #100-12, pp. 16-22.  The fact

that there are no corresponding reports of misconduct in the unit logs, as there should

have been, creates a genuine issue as to whether the continuing deprivations were

justified by plaintiff's poor conduct on the cell block.  Dkt. #102, ¶¶ 26, 29.  Lastly,

although this court is hard-pressed to imagine how it is possible to exercise in a 3' X 6'

space inside of an unventilated cell covered in plexiglass, it would be inappropriate to

resolve this issue on summary judgment.  *See Williams II*, 142 F. Supp. 2d at 427

(holding that issues of whether plaintiff had meaningful opportunity for in-cell exercise,

and whether defendants' actions were justified "require weighing the credibility of both

lay and expert witnesses" and are "determinations within the province of a jury").


## *Exposure to Unnecessary Health Risks through Use of Unsupervised SHU Porters (Griffin, Prack, Sheahan, and Signor)*

Plaintiff alleges that defendants Griffin, Prack, Sheahan, and Signor

permitted the use of unsupervised SHU porters at Southport despite knowing that

porters routinely denied food and threw feces on inmates confined to their cells.  This

Court finds that confining an inmate to his cell and allowing another inmate to assault

him with feces, if established, would satisfy the objective element of an Eighth

Amendment claim.  The Second Circuit Court of Appeals has "long recognized that

unsanitary conditions in a prison cell can, in egregious circumstances, rise to the level

of cruel and unusual punishment."  *Walker v. Schult*, 717 F.3d 119, 127 (2d Cir. 2013);

*see Lareau v. Manson,* 651 F.2d 96, 106 (2d Cir. 1981) (noting that prisoners are

entitled to sanitation among other things); *LaReau v. MacDougall,* 473 F.2d 974, 978

(2d Cir. 1972) (recognizing that "[c]ausing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted"); *Young v. Quinlan,* 960 F.2d 351, 365 (3d Cir. 1992) (holding that the denial of "basic sanitation . . . is cruel and unusual because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose"), *superseded on other grounds by* 42 U.S.C. § 1997e.

Indeed, unsanitary conditions lasting for mere days may constitute an Eighth Amendment violation. *See, e.g., Gaston v. Coughlin,* 249 F.3d 156, 165-66 (2d Cir. 2001) (holding that inmate stated an Eighth Amendment claim where the area in front of his cell "was filled with human feces, urine, and sewage water" for several consecutive days); *Wright v. McMann,* 387 F.2d 519, 522 (2d Cir. 1967) (holding that placement of prisoner for thirty-three days in cell that was "fetid and reeking from the stench of the bodily wastes of previous occupants which . . . covered the floor, the sink, and the toilet," would violate the Eighth Amendment).

Likewise, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners," and the failure to do so may violate the Eighth Amendment. *Cortes-Quinones v. Jimenez-Nettleship,* 842 F.2d 556, 558 (1st Cir. 1988); *see also Wilson,* 501 U.S. at 303 (describing "the protection [an inmate] is afforded against other inmates" as a "conditio[n] of confinement" subject to the strictures of the Eighth Amendment). "Having incarcerated persons [with] demonstrated proclivit[ies] for antisocial, criminal, and often violent conduct, . . . having stripped them

of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833-34 (internal quotations and citations omitted). "Prison conditions may be restrictive and even harsh," but "gratuitously" allowing the assault of one prisoner by another "serves no legitimate penological objectiv[e]" any more than it "squares with evolving standards of decency." *Id.* (internal citations and quotations omitted).

Plaintiff asserts that defendants allowed another inmate to assault him with feces while plaintiff was locked defenseless in his cell, did nothing to protect plaintiff from the attack, and thereafter refused to let him shower for 18 days. These are egregious circumstances which, if proven, would constitute cruel and unusual punishment. That being said, there exist genuine issues of fact on this record as to whether defendants ignored the risk that an unsupervised porter would assault another inmate in this repulsive manner. Signor admitted that he had received complaints from inmates that SHU porters were withholding food from them, Dkt. #112-2, ¶ 67, suggesting that he knew that the porter position was subject to abuse. Labar admitted that inmates "frequent[ly]" threw feces at Southport and it was not an uncommon occurrence. Dkt. #102, ¶ 71. Griffin, Prack, Sheahan, and Signor, on the other hand, claim that feces-throwing was "not frequent" and was addressed on a case-by-case basis. Dkt. #100-1, ¶ 34.

Regarding the risk that a porter would attack plaintiff in particular, plaintiff has offered proof that Prack, Griffin, Sheahan, and Signor had actual notice that he was being threatened and abused by SHU porters because he was white.  Griffin, Prack, Sheahan, and Signor do not dispute that they received Plaintiff's August 22, 2010 letter, in which he characterized himself – often the token white prisoner on his cell block – as a "sacrificial lamb for the racial animosity between the black inmates and the white staff," and asserted that he was "defenseless locked in the cell" while the black porters operated with "absolutely no supervision."  Dkt. #102-1, p. 92.  Prack and Sheahan deflected plaintiff's request to be transferred to a block where staff served the food, and Signor denied it as "anticipat[ory]."  Dkt. #102-1, pp. 48, 94, 96.  Adding to this risk was the decision to assign Bernard Cooper, an inmate with an unhygienic act on his institutional record, as an unsupervised SHU porter on plaintiff's cell block.  Dkt. #112-2, ¶ 89.

Defendants' contention that they had "no control whatsoever over inmates throwing feces or denying food" (Dkt. #100-1, ¶ 33) is no answer.  In fact, this pithy statement perfectly captures plaintiff's chief complaint:  that Southport officials allowed inmate porters to do whatever they wanted to other inmates confined in their cells.  Defendants argue that plaintiff has not cited to a single instance in which defendants have knowingly allowed an inmate to continue as a SHU porter after abusing another inmate.  This creates a genuine issue as to whether defendants were aware of the risk that plaintiff would be assaulted by a SHU porter in the manner that he was.  However, plaintiff has cited to sufficient evidence – Labar's admission that throwing feces was

frequent at Southport, plaintiff's letter complaining of abuse at the hands of SHU

porters, and the fact that inmate Cooper committed a prior unhygienic act – to survive

defendants' motion for summary judgment.  For the foregoing reasons, both defendants'

and plaintiff's motions for summary judgment are denied on this claim.


### Deprivation of Outdoor Exercise and Return to Mechanical Restraints, November 2010 – January 2011 (Sheahan and Bartlett)

Plaintiff contends that as a result of his guilty disposition for an "unhygienic

act," he was denied outdoor recreation for 24 days and thereafter returned to

mechanical restraints for another 36 days.  Dkt. #10, ¶¶ 215-17.  For the reasons set

forth above relating to plaintiff's deprivations from July through September 2010,

summary judgment is denied as to both plaintiff and defendant.


**Declaratory Relief**

### Declaratory Judgment that Southport's Mechanical Restraint Policy is Unconstitutional (Fischer, Prack, Griffin, and Sheahan)

Plaintiff asserts that Fischer, Prack, Griffin, and Sheahan violated his

constitutional rights by promulgating and continuing Southport's policy of requiring level

one inmates to wear mechanical restraints while in the exercise cage without a written

individual restraint orders or an appeal mechanism.  Plaintiff argues that the policy

constitutes "summary punishment" that is not imposed on "inmates similarly situated

serving SHU time in every other SHU in New York State, and inmates on level 2 and 3

in Southport."  Dkt. #10, ¶ 79.  Plaintiff seeks "a declaration that the regulation,

7 NYCRR § 305.3(c)(2)(ii), authorized and promulgated by Defendant Commissioner Brian Fischer violated Plaintiff's rights pursuant to the 8th and 14th Amendments of the United States Constitution."  Dkt. #10, ¶ 241.

According to the amended complaint and DOCCS' Inmate Locator, plaintiff was transferred to another facility and is no longer housed at Southport.  "In this [C]ircuit, an inmate's transfer from a prison facility generally moots claims for declaratory . . . relief against officials of that facility."  *Sheperd v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011).  Here, plaintiff has named two Southport defendants (Griffin and Sheahan) against whom plaintiff's mechanical restraint claim is mooted by reason of his transfer from Southport.  Plaintiff's claim against DOCCS Commissioner Fischer[10] and DOCCS Director of Special Housing and Inmate Discipline Prack may proceed.  *Wright v. New York State Dep't of Corr. & Cmty. Supervision*, 568 F. App'x 53, 55 (2d Cir. 2014).

"Balanced against the constitutional protections afforded prison inmates . . . are the interests of prison officials charged with complex duties arising from administration of the penal system."  *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)).  Given "the complexities of prison administration," *id.,* federal courts accord great deference to prison officials and apply "a lesser standard of scrutiny . . . in determining the constitutionality of the prison rules."  *Turner v. Safley,* 482 U.S. 78, 81 (1987).  The governing standard is one of "reasonableness;" that is, whether the particular regulation affecting the constitutional

---

[10] Since the commencement of this case, Anthony J. Annucci was named Acting Commissioner of DOCCS.

right asserted by a prisoner is "reasonably related to legitimate penological interests."
*Turner,* 482 U.S. at 89.  In assessing reasonableness, a court may consider:
(1) whether there is a rational relationship between the regulation and the legitimate
government interests asserted; (2) whether the inmates have alternative means to
exercise the right; (3) the impact that accommodation of the right will have on the prison
system; and (4) whether ready alternatives exist which accommodate the right and
satisfy the governmental interest.  *Turner,* 482 U.S. at 89-90.

Plaintiff contends that given impenetrable nature of the exercise cage, the
fact that inmates exercise alone, and the existence of procedures for officers to shackle
and unshackle inmates as they enter and exit the cage, the regulation requiring all level
one inmates to wear mechanical restraints is wholly unreasonable.  He also contends
that there is an "obvious" alternative to Southport's default mechanical restraint policy;
specifically, requiring an individual written restraint order when an inmate is to be
shackled in the exercise cage as they do at every other DOCCS facility.  *See* 7 NYCRR
305.4.  The existence of this easy alternative, plaintiff argues, is evidence that the
restraint policy is not reasonable, but is "an exaggerated response to prison concerns."
*Turner*, 482 U.S. at 91.

For their part, Fischer and Prack argue that "[t]he exercise restraint policy
for [level I PIMS inmates is entirely reasonable for the safe and secure operations of
[Southport]."  Dkt. #100-2, p. 12.  Even giving deference to defendants, this argument
grossly oversimplifies plaintiff's claim regarding the mechanical restraint policy.

Nonetheless, this Court finds that there are insufficient facts in the record from which it can assess the impact that accommodating plaintiff's right to exercise free from mechanical restraints absent an individual restraint order would have on Southport's prison resources.  This issue would have to be more closely examined by a jury at trial.  For these reasons, plaintiff's request for declaratory relief regarding the mechanical restraint policy is denied as moot as to Griffin and Sheahan, but may proceed as against Griffin and Prack.  Defendants' and plaintiff's motions for summary judgment on this claim are denied.

**Personal Involvement**

Defendants must be personally involved in an alleged constitutional deprivation for a plaintiff to be awarded damages under 42 U.S.C. § 1983.  *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)*; Colon*, 58 F.3d at 873; *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989).  A plaintiff may demonstrate a defendant's personal involvement by evidence that:  (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring.  *Colon*, 58 F.3d at 873.  "There is no *respondeat superior* liability in § 1983 cases."  *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995).  Put another way,

supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).

Defendants Fischer and Prack argue that they lack the requisite personal involvement to maintain a claim against them under 42 U.S.C. § 1983. This Court does not agree. Fischer and Prack are responsible for continuing the PIMS and SHU porter policies upon which plaintiff's claims are predicated. Through his papers, Fischer stated that he was responsible for the management of DOCCS and that he was aware of Southport's PIMS policies. Dkt. #100-5, ¶¶ 7-8. Prack was aware of Southport's "special" requirement that inmates on level one remain restrained in handcuffs and a waist chain during recreation. Dkt. #100-10, ¶¶ 5-7. Regarding the use of unsupervised SHU porters, plaintiff has presented proof that Prack received his August 22, 2010 letter alleging that he was being abused by unsupervised SHU porters because he was white. Prack even replied to his letter, advising plaintiff to "discuss his transfer concerns with [his] correction counselor." Dkt. #102-1, p. 96. As the Commissioner and Director of SHU Housing, both men were in a position to influence on some level the mechanical restraint policy and the use of unsupervised SHU porters. Plaintiff has established enough personal involvement on the part of these defendants to survive defendants' motion for summary judgment.

**Qualified Immunity**

"Government officials performing discretionary functions[ ] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A law is "clearly established" when the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A court need not have ruled on a defendant's identical course of conduct for the right to be "clearly established;" however, in the light of pre-existing law "the unlawfulness must be apparent." *Id.* Even in cases involving violations of a clearly established right, "officials may still successfully assert qualified immunity if they can show that their actions were 'objectively reasonable.'" *Williams v. Greifinger,* 97 F.3d at 703 (internal citations omitted). Where there are facts in dispute that are material to a determination of reasonableness, summary judgment on the basis of qualified immunity is not appropriate. *Thomas*, 165 F.3d at 143.

Regarding the substantive due process claim, this Court finds that Sampsell, Labar, Granger, and Fluman are not entitled to qualified immunity because plaintiff had a clearly established right to appeal his July 2010 disciplinary sanction without being retaliated against. Insofar as questions remain as to the reasonableness of defendants' conduct, those are best left to a jury. Likewise, defendant Donahue is not entitled to qualified immunity on plaintiff's due process claim because plaintiff's right to an impartial hearing officer was also clearly established at the time of the November

2010 hearing.  As previously discussed herein, Donahue demonstrated clear bias against plaintiff by:  precluding him from asking questions about inmate Cooper, the log books, and the feces pattern; denying plaintiff's request to call Fluman, who was an essential witness; and threatening to remove plaintiff from the hearing whenever he lodged an objection.  This conduct not only violated plaintiff's due process rights, it was decidedly unreasonable under the circumstances.

Plaintiff's exercise deprivations between July and September of 2010 and November 2010 and January 2011 present closer qualified immunity questions. Exercise is a basic human right protected by the Constitution, and a deprivation of exercise for more than thirty days can violate an inmate's Eighth Amendment rights. *Williams I,* 111 F. Supp. 2d at 292; *Davidson*, 968 F. Supp. at 131.  Nonetheless, it cannot be said that Sheahan and Hetrick acted "unreasonably" by authorizing the exercise deprivation imposed by Bartlett.  Nor was it patently "unreasonable" for Sheahan and Bartlett to authorize the later deprivations imposed by Donahue.  Neither Sheahan nor Bartlett were parties to the alleged retaliation against plaintiff nor were they involved in his November 2010 hearing where Donahue demonstrated his obvious bias.  In authorizing plaintiff's deprivations, Sheahan, Hetrick, and Bartlett relied on the reports from staff that plaintiff was being uncooperative and disruptive.  This reliance, in and of itself, was not unreasonable as it was not apparent that the reports were falsified. For this reason, Sheahan, Hetrick, and Bartlett are entitled to qualified immunity on plaintiff's Eighth Amendment exercise deprivation claims.

Fischer, Prack, and Griffin, who were responsible for the continuation of Southport's mechanical restraint policy, are not entitled to qualified immunity. Numerous cases establish an inmate's right to exercise and plaintiff has presented sufficient evidence that the mechanical restraints prevented him from breathing and foreclosed "all meaningful exercise" for more than 30 days.  If this was in fact the case, it would not have been "reasonable" for Fischer, Prack, and Griffin to continue the mechanical restraint policy simply because it was long established.

This reasoning applies with equal force to the use of SHU porters.  An inmate has a Constitutional right to not be confined in unsanitary conditions and to not be assaulted by another inmate, rights which are clearly established.  *Walker*, 717 F.3d at 127; *Farmer*, 511 U.S. at 833-34.  Prack, Griffin, Sheahan, and Signor were on notice that unsupervised inmate porters were abusing their positions and targeting plaintiff because he was white.  Nonetheless, they allowed the practice of using porters to continue and even assigned an inmate with a history of unhygienic conduct to serve as a porter on plaintiff's cell block.  Questions regarding whether defendants' conduct was reasonable remain unanswered and foreclose summary judgment on the basis of qualified immunity for these defendants.  *Thomas*, 165 F.3d at 143.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART and plaintiff's cross-motion for summary judgment is GRANTED IN PART and DENIED IN PART, as follows:

Defendant Bartlett's motion for summary judgment on plaintiff's due process claim related to the July 2010 hearing is GRANTED, and plaintiff's cross-motion for summary judgment on this claim is DENIED.

Defendants Sampsell, Labar, Granger, and Fluman's motion for summary judgment and plaintiff's cross-motion for summary judgment on plaintiff's retaliation claim are both DENIED.

Plaintiff's cross-motion for summary judgment on his due process claim against Donahue related to the November 2010 hearing is GRANTED on the issue of liability, and defendants' motion for summary judgment on this claim is DENIED.

Defendants Sheahan and Hetrick's motion for summary judgment on plaintiff's Eighth Amendment exercise deprivation claim (July – September 2010) is GRANTED on the basis of qualified immunity, but defendants Fischer, Prack and Griffin's motion for summary judgment on this same claim is DENIED.  Plaintiff's cross-motion on this claim is also DENIED.

Defendants Prack, Griffin, Sheahan, and Signor's motion for summary judgment and plaintiff's cross-motion for summary judgment on his Eighth Amendment claim related to the use of unsupervised SHU porters are DENIED.

Defendant Sheahan and Bartlett's motion for summary judgment on plaintiff's Eighth Amendment exercise deprivation claim (November 2010 – January 2011) is GRANTED on the basis of qualified immunity, and plaintiff's cross-motion is DENIED.

Plaintiff's claim challenging Southport's mechanical restraint policy is DISMISSED AS MOOT as against Griffin and Sheahan, but may continue as against Fischer and Prack.  Both defendants' motion and plaintiff's cross-motion for summary judgment are DENIED.

The Clerk of the Court is directed to terminate Bartlett and Hetrick as parties to this action.

**SO ORDERED.**

**DATED:      Buffalo, New York**
**             March 11, 2016**

                              *s/H. Kenneth Schroeder, Jr.*
                              **H. KENNETH SCHROEDER, JR.**
                              **United States Magistrate Judge**